Filed 4/18/14  P. v. Ott CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | C070342 |
| v. | (Super. Ct. No. 10F04088) |
| GERALD THOMAS OTT, | |
| Defendant and Appellant. | |

Defendant Gerald Thomas Ott was tried by jury and convicted of two counts of forcible rape (Counts One and Five), one count of torture (Count Two), and one count of inflicting corporal injury on a cohabitant (Count Three).[1]  With respect to Count Five, the jury found four aggravating circumstances alleged under the one-strike sex offender law to be true.  As to Count Three, the jury found defendant inflicted great bodily injury under circumstances involving domestic violence.  The trial court sentenced defendant to

---

[1]     The jury acquitted defendant of one count of kidnapping with intent to commit rape (Count Four).

serve an aggregate indeterminate term of 40 years to life in state prison and imposed other orders.

On appeal, defendant contends: (1) the evidence is insufficient to support his rape conviction in Count One and the one-strike findings attached to his rape conviction in Count Five; (2) the trial court prejudicially erred and violated defendant's constitutional rights by precluding him from impeaching one of his victims by having her try on the jeans she wore the day of the rape; (3) the trial court prejudicially erred by failing to instruct the jury to indicate on its Count Two verdict form the specific act it found constituted the crime of torture; and (4) the trial court abused its discretion and violated defendant's constitutional rights by removing a juror during deliberations without a sufficient showing of good cause. Defendant's trial counsel filed an amicus curiae brief raising an additional issue. He argues: (5) the trial court erred in sentencing defendant because it aggravated both of his rape convictions under the one-strike sentencing scheme.

We disagree and affirm the judgment. As we explain, substantial evidence supports defendant's rape conviction and one-strike findings. The trial court did not abuse its discretion or violate defendant's constitutional rights by excluding defendant's proposed impeachment by demonstration because defendant did not carry his burden of showing the conditions of the demonstration would have been substantially similar to the conditions existing the night of the rape. The trial court had no duty to instruct the jury to indicate on the verdict form the specific act it found constituted torture. Nor did the trial court abuse its discretion or violate defendant's constitutional rights by removing a juror during deliberations for conducting outside legal research against the express admonition of the trial court. Finally, we also disagree with the argument raised in trial counsel's amicus curiae brief. The trial court did not err in sentencing defendant to an aggravated term for each of his rape convictions.

2

FACTS

Because defendant challenges the sufficiency of the evidence to support both his rape conviction in Count One and the one-strike findings attached to his rape conviction in Count Five, we describe in detail the facts surrounding these crimes. In accordance with the standard of review, we do so in the light most favorable to the judgment. (See *People v. Garcia* (2011) 194 Cal.App.4th 612, 614.)

### *Count One*

In Count One, defendant was convicted of the forcible rape of Kristen R. Defendant met Kristen R. on the Internet, through a social networking Website called "Tagged." Kristen R. was married with three children, but was having marital problems. When defendant explained he was out of work, Kristen R. offered to help him find a job and agreed to meet with him at a restaurant. Because defendant did not have transportation, Kristen R. picked him up in her GMC Denali. They had dinner and drinks at a restaurant in Elk Grove and then went to a nearby dive bar. After spending some time at the bar, Kristen R. drove defendant back to where he was staying. Before defendant got out, he and Kristen R. talked for awhile in the Denali and became intimate. After they climbed into the back seat, defendant performed oral sex on Kristen R. and the two engaged in sexual intercourse. Defendant then got out of the vehicle and Kristen R. drove home.

Sometime later, after Kristen R. had seen defendant two or three more times, she received a phone call from him saying he was in the restroom at a Chevron station, had no place to sleep, and it was 40 degrees outside. Defendant was crying and begged for her help. Kristen R. asked her husband if defendant could stay at their house for one or two nights until he found another place to stay. He agreed. Kristen R. then picked defendant up and brought him to the house. Defendant ended up staying with Kristen R. and her family for about six weeks. During this time, defendant monitored her phone calls. He periodically prevented her from walking away from conversations by using his

3

body to block her movement. Defendant also prevented her from leaving in the Denali without him "[a]t least a dozen times" by running out to the vehicle, getting in, and refusing to get out.

Despite defendant's controlling behavior, and his close proximity to her husband and children, Kristen R. continued the romantic relationship with him. On one occasion, they had sex in the bedroom she shared with her husband. On three or four occasions, Kristen R. rented defendant a motel room for the night because it was "getting too stressful" having him at the house and her husband "wanted him to get out." They had sex in two of these motel rooms. Describing one such encounter, Kristen R. testified she did not "willingly" have sex with defendant, but rather "felt pressured and scared because he often times would say that he would tell [her] husband" about the affair. While defendant did not threaten to tell her husband unless she had sex with him that night, she explained the possibility "was in [her] mind because he had brought that up prior." She also testified that, when defendant had threatened to tell her husband, she dialed her husband on the phone, handed the phone to defendant, and told him to "go ahead."

The events forming the basis of the rape charged in Count One began with Kristen R. driving defendant to a few job interviews. The last interview of the day was at Beck's Furniture on Madison Avenue, about two miles from her house. After the interview, she and defendant went to a bar in the same shopping center, where they drank for a couple hours. When they left, she asked defendant to drive because she felt intoxicated. He agreed. Kristen R. became uncomfortable with defendant's driving shortly after he pulled out of the parking lot and told him to pull over two or three times. When defendant turned into a residential neighborhood, she told him she was scared and wanted to get out of the vehicle. The Denali was still moving when she opened the door. Defendant said, "what are you doing," and accelerated, throwing Kristen R. from the SUV. The impact with the pavement resulted in two leg fractures, both below the left knee. Defendant stopped the car, got out, and yelled: "[W]hat are you doing?" He then

4

picked her up and placed her back in the passenger's seat. Kristen R. told defendant she was in "a lot of pain" and she "hurt [her] leg pretty bad."

Defendant then drove to another location, "in a dark alley behind a building." He said he wanted to "wait and see" how she was doing before driving back to her house. Kristen R. said that she was "hurting" and "needed to get to the hospital." Defendant told her to "get out of the car and try to walk." She repeated her request to go to the hospital. At some point, Kristen R. fell asleep. When she woke up, she again asked to be taken to the hospital. Rather than take her, defendant "started to come on to [her]," putting his arms around her and asking for sex. Kristen R. responded: "No. I'm hurt." Defendant then started "begging." Kristen R. was "shocked" that "he was asking [her] to do that under the circumstances" and again told him no. Defendant got out of the Denali, walked around to the passenger side, and opened the passenger door. He then climbed on top of her, pushed the seat back, and pulled her pants and underwear down to her ankles. Kristen R. cried and said: "No. I don't want to do this." She also said: "Stop. I'm hurting. My leg's hurt." Defendant told her she would be fine, pulled down his pants, and had sex with her. Kristen R. explained he was "very forceful," and elaborated he was "not taking no for an answer, just continuing to, you know, come on, it's okay, you know, I really want it; I really need it kind of a thing." At some point, either as defendant was opening the passenger door from outside the Denali or after he climbed into the vehicle and pulled her pants down, Kristen R. said: "Okay. Just do it."

After defendant ejaculated, he returned to the driver's seat and "acted like nothing was wrong." Kristen R. was still crying and told him she "was in a lot of pain" and "needed to get to the hospital." Defendant finally complied with her request and drove her to the emergency room at Mercy San Juan Medical Center. He moved out of Kristen R.'s house "a week or two" later.

5

### *Counts Two, Three, and Five*

In Counts Two, Three, and Five, defendant was convicted of the torture, domestic assault, and forcible rape of Janet P. Defendant met Janet P. about three months after the rape described above. He also met her through "Tagged." Janet P. was single with three children, two of whom lived with her. After chatting online and speaking over the phone, they agreed to meet in person at a liquor store in Carmichael. Defendant arrived by bicycle. Janet P. arrived by Ford F-150. She was "charmed" by defendant's "free-spirited and happy" demeanor and agreed to go with him to a nearby bar. A few drinks later, they went back to defendant's place, a room he rented not far from the liquor store. They "hung out" and ultimately had sex. Janet P. then drove home.

Three months later, defendant moved in with Janet P. and her children. Janet P. described the intervening months as "a very whirlwind, fairytale courtship," although she also acknowledged there were "red flags that [she] ignored." She described these red flags: "Extreme, excessive control and demand to know where I was, excessive phone calls, showing up at my door, showing up at my back door, even going down the street on his bike to my children's [school] while I dropped my children off at school in the morning." This "obsessive and controlling" behavior increased after defendant moved in. Janet P. explained: "I couldn't come and go as I pleased. I couldn't even go to the grocery store to get groceries without him either running out and jumping in the car or demanding to -- or following me, to go get his bike or get on his bike and follow me up to the grocery store. [¶] Taking my children to school. He would run out and jump in the car, and it just -- I couldn't do anything without him obsessively following me around like this puppy." Janet P. confronted defendant about his behavior, but he "always smoothed it over and made [her] feel special, so [she] excused it."

Within a month of defendant moving in, his controlling behavior became violent. On many occasions, Janet P. tried to leave the house without defendant and he physically restrained her inside the house against her will. Sometimes he would grab the truck keys

6

from her, causing cuts on her hands. Other times, he would grab her purse, which was hanging from her shoulder, and use the strap "like a slingshot to throw [her] against the wall." When she made it to the truck, defendant would follow, pull the keys out of the ignition, and either pull her out of the truck or tell her she could not leave. On one occasion, "he literally jumped on the hood of [her] truck and held onto it" as she tried to pull away. Not wanting to hurt him, she stopped the truck, they yelled at each other, and defendant got into the passenger seat to prevent her from leaving without him. Ultimately, defendant would blame Janet P. for causing the confrontation, either deny he hurt her or say that he did not mean to do so, and demand she have sex with him to make up for her transgression. When Janet P. refused, defendant would say: "You need to show me you care. I want to make love to you." As she explained: "He calmed me down and manipulated me, and I gave in against my will to keep peace."

Such confrontations happened at least three times a week, prompting Janet P. to file an application for a restraining order against defendant. The day she filed the application, Janet P. found defendant hiding in her bedroom, having apparently climbed in through the window. When she entered the room, defendant stood up from behind the bed. Janet P. yelled for one of her sons to call 911 and told defendant she had filed for a restraining order. Defendant "came after [her] and proceeded to push [her] up against the wall" with his hand over her mouth, causing a "fat lip." Defendant "begged and pleaded" for her not to go forward with the restraining order and said that "he was sorry." He left before the police arrived and moved out a short time later, initially into a hotel room.

After two or three weeks without contact, defendant called Janet P. and told her he wanted "closure" on their relationship. He said that he wanted to see her for "a few minutes, maybe ten minutes," to "make peace and go [their] separate ways." Janet P. agreed and drove to defendant's hotel room, where he managed to convince her to have sex with him and resume their relationship. Following the reconciliation, defendant did not move back into Janet P.'s house, but instead got his own apartment. This situation

7

reduced the amount of physical abuse, but increased the level of control defendant tried to exert. Janet P. described: "Excessive calling, phone calls, riding his bike to my house because it was within one mile, showing up at my front door, my back door, coming through windows." There were also incidents of violence. On one occasion, while Janet P. was at defendant's apartment, he threw her into the kitchen wall and put his hand over her mouth to prevent her from yelling for help. Contact with the wall caused a "black eye" and "fat lip." Janet P. fell to the ground next to the kitchen table, but was able to get up and make her way out of the apartment, despite defendant's attempt to pull her back inside. She then drove home, picking up her youngest son from a friend's house on the way. When they got home, Janet P. went to her bedroom, turned on the light, and defendant "stood up from beside [her] bed." Janet P. "became pretty hysterical" and "screamed to [her] son to call 911." Defendant ran out of the house through the front door.

The events forming the basis of the crimes charged in Counts Two, Three, and Five occurred about a month later. Janet P. was at defendant's apartment making garage sale signs at his kitchen table. Her plan was to move to Vallejo in a couple weeks without telling him. About 9:30 p.m., after having dinner and sharing a bottle of wine, Janet P. and defendant got into an argument over another woman calling defendant on the phone. When Janet P. tried to leave, defendant grabbed her purse and pulled her back into the apartment. As Janet P. "bolted towards the bedroom," defendant followed and "threw [her] onto his bed." She then "jump[ed] up" from the bed, ran into the bathroom, and grabbed for the towel rack, accidentally pulling it from the wall and breaking it in half in the process. With half of the towel rack in each hand, Janet P. "came out of the bathroom swinging." She hit defendant in the abdomen and ran for the front door. Before she could reach the door, defendant picked her up and said: "I'll show you." He then carried her out the front door of his second-floor apartment, lifted her over the railing, and dropped her 12 feet 9 inches to the concrete landing below.

8

The impact with the concrete caused multiple pelvis fractures and a fracture of the left elbow. Janet P. felt as though her body "exploded from the inside out," explaining: "Every bone in my body felt shattered. I could not move. I heard my bones grinding in my pelvis. I could not move my left arm, I could hardly breath[e], and the pain was excruciating, and I thought I was paralyzed or just busted up. I didn't even know if I was gonna live." When defendant came down the stairs, Janet P. repeatedly asked him to call 911. Defendant refused and told her to "be quiet." He then grabbed her by the arms and dragged her into the parking lot beside her truck while she pleaded: "Please stop. Please don't move me. I'm really hurt. Please call 911." Defendant rolled her under the truck, and told her to "be quiet" and "pretend that [she] was looking for something." Unable to move and realizing she was "at his mercy," Janet P. did as she was told. Defendant then ran upstairs and returned with a blanket, which he wrapped around her before picking her up from beneath the truck and carrying her back to his apartment. Janet P. again pleaded: "Please don't move me."

Defendant carried Janet P. into his bedroom and placed her on his bed. She begged and pleaded for him to call 911. He did not do so. After what "felt like a long time," Janet P. needed to use the restroom. Defendant, who had been lying beside her on the bed, started to pick her up to carry her to the bathroom. Janet P. screamed out: "[P]lease don't move me out of alignment." Defendant returned her to her original position, brought a cup to the bed, and helped her to urinate in the cup. More time passed, during which defendant resumed his position next to Janet P. on the bed and she resumed her pleas for him to call 911. Defendant responded: "You need to show me you care. I want to make love to you." Janet P. answered: "No, please don't. I'm very broken. Please call 911." Defendant got up, brought her a pill, and said: "I think this is Ibuprofen," and "I hope maybe it will make you more comfortable." He then said he was "just fucking with [her]" and he "didn't mean to drop [her]." Janet P. responded: "Okay, I'll pretend I fell. Just please call 911." Rather than call for help, defendant repeated:

9

"You need to show me you care" and "I want to make love to you." He then "climb[ed] on top of [her]," and "proceeded to pull [her] underwear to the side as [she] begged and pleaded [for] him not to, and he proceeded to have intercourse with [her] anyway." Janet P. described the act as feeling like "[a] blow torch going in and out of [her] vagina."

After defendant ejaculated, he climbed off of Janet P. and asked if they could "work through it." She again said she would "lie and say that [she] fell down the stairs" and "ask[ed] him continuously to call 911." Janet P. eventually fell asleep. Her efforts to convince defendant to call for help resumed the next morning. About 10:00 a.m., defendant finally called for an ambulance. Paramedics arrived a short time later and transported Janet P. to UC Davis Medical Center. She initially told medical staff she had fallen down the stairs. The truth surfaced four days later, after she underwent two surgeries to reconstruct her pelvis and arm.

### Prior Incidents of Domestic Violence

The prosecution also introduced evidence defendant had committed prior acts of domestic violence against Melanie Watts, Jacqueline Luck, and Luanna Nelson. We need not recite the details of these incidents. It will suffice to say defendant's violent and controlling behavior did not begin with Kristen R. and Janet P.

### Defendant's Version of Events

Defendant testified in his own defense. With respect to Count One, defendant testified he immediately stopped the Denali after Kristen R. opened the passenger door and fell out. When he walked back to check on her condition, Kristen R. said she hurt her leg. Defendant asked her whether or not she could walk on it and carried her back to the vehicle after she unsuccessfully tried to do so. On the drive back to her house, Kristen R. said they needed to figure out what to tell her husband. This prompted defendant to park in an alley behind a strip mall. Kristen R. stepped out of the Denali to take a better look at her leg. Defendant walked around to the passenger side and also looked at her leg. Kristen R. then sat down in the passenger seat with the door open. She

10

and defendant talked and "started to get affectionate." Defendant "asked if [he] could make love to her, and eventually that's what happened." He explained that "she turned around, and [they] had sex right there with her standing up and [defendant] behind her. She was leaning over the passenger's seat." According to defendant, Kristen R. was "very willing" and "[n]ever said no." After having sex, they got back in the Denali and fell asleep for a couple hours. When they woke up, Kristen R. asked to be taken to the hospital for the first time. Defendant complied.

With respect to Counts Two, Three, and Five, defendant testified Janet P. initiated the physical abuse in their relationship and he had slapped her on a single occasion, after she punched him. Defendant acknowledged there were incidents in which he took Janet P.'s backpack and keys to prevent her from leaving in the middle of an argument. Regarding the incident forming the basis of the charges, defendant confirmed Janet P. was at his apartment making garage sale signs and they shared a bottle of wine that night. He also testified they had two or three mixed drinks. At some point, Janet P. became angry after scrolling through defendant's cell phone. Following a struggle for the phone, defendant agreed to show her all of his text messages. According to defendant, one particular message prompted Janet P. to punch him "pretty hard in the face." He "calmed her down" and they continued to go through his messages. She then "got mad again and walked into the bathroom." Defendant "followed behind her, talking with her, trying to calm her down, and she slammed the door on [his] face." As defendant tried to get into the bathroom, Janet P. opened the door and "grabbed the towel bars off the bathroom wall, grabbed both of them and began coming at [him] like a -- like a Samurai warrior, swinging -- swinging at [him] through the living room." After being hit one or two times, defendant disarmed his attacker and told her to leave. He then picked up Janet P., who was "yelling and screaming," opened the door, and carried her outside to take her down to her truck. She was "squirming" and defendant "was having a hard time holding onto her." When he "tried to use the railing as leverage to try to get a better grip on her," she

11

"went over the railing too far." Defendant yelled for her to "hold on," but she fell to the concrete below.

Defendant ran downstairs "freaking out" and "almost in tears." He told Janet P. he was sorry and he did not mean to drop her. She responded: "I know, we both fucked up." Defendant then tried to help her to stand up, but she was in "too much pain," so he returned her to the ground. They then decided defendant would take her to the hospital in her truck, so he "picked her up from behind" with his "arms underneath her arms" and "carefully pulled her back to the truck." According to defendant, Janet P. complained about being in pain, but was not "screaming" or "crying" and never told defendant not to move her. Defendant "gently laid her on the ground," opened the passenger door, and tried to lift her into the passenger seat. Janet P. "said it hurt too much," so defendant placed her back on the ground. After running upstairs and grabbing a blanket, defendant again tried to lift her into the truck. This attempt also failed. They then discussed calling an ambulance and defendant suggested they go back to the apartment to "see if she has insurance." She agreed. Defendant dragged Janet P. up the stairs and into his apartment the same way he dragged her to the truck. He then placed her on his bed. While on the bed, Janet P. never asked defendant to call 911 and said the pain was "bearable" as long as she did not move.

According to defendant, it was about an hour or two later that he had sex with Janet P. In the meantime, he tried to research whether she had insurance, but was unable to find out because the office he wanted to call was closed. They agreed to call the next morning. Janet P. then asked defendant to help her to change into something more comfortable. After removing her pants, defendant "started kissing on her feet" and "up her legs," which she "seemed to enjoy." When defendant told Janet P. he wanted to "make love to her," she said she was "on [her] period." She then told defendant he could remove the tampon. Defendant did so. He then helped her to take off her shirt and bra, which was "slightly painful" because of her "hurt elbow." They then had sex, during

which Janet P. did not complain of any pain and made "pleasurable sounds." Afterwards, they slept for five or six hours. The next morning, defendant verified Janet P. had insurance and called an ambulance.

DISCUSSION

I

*Sufficiency of the Evidence*

Defendant contends the evidence is insufficient to support both his rape conviction in Count One and the one-strike findings attached to Count Five. We disagree.

" 'To determine the sufficiency of the evidence to support a conviction, an appellate court reviews the entire record in the light most favorable to the prosecution to determine whether it contains evidence that is reasonable, credible, and of solid value, from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citations.]" (*People v. Wallace* (2008) 44 Cal.4th 1032, 1077; *Jackson v. Virginia* (1979) 443 U.S. 307, 317-320 [61 L.Ed.2d 560, 572-574].) The standard of review is the same in cases in which the prosecution relies on circumstantial evidence. (*People v. Snow* (2003) 30 Cal.4th 43, 66.) " 'Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt.' " (*People v. Stanley* (1995) 10 Cal.4th 764, 792-793.) Accordingly, we must affirm the judgment if the circumstances reasonably justify the jury's finding of guilt regardless of whether we believe the circumstances might also reasonably be reconciled with a contrary finding. (*People v. Thomas* (1992) 2 Cal.4th 489, 514.)

We address and reject defendant's sufficiency of the evidence arguments immediately below.

## A.

### *Count One*

Defendant argues the evidence is insufficient to support his rape conviction in Count One because he did not engage in intercourse with Kristen R. until she said, "Okay, just do it." He is mistaken.

Forcible rape is "an act of sexual intercourse accomplished with a person not the spouse of the perpetrator" that is "accomplished against a person's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the person of another." (Pen. Code, § 261, subd. (a)(2).)[2] Against a person's will means without that person's consent. Thus, "[l]ack of consent is an element of the crime of rape. Consent is defined in section 261.6 as 'positive cooperation in act or attitude pursuant to an exercise of free will. The person must act freely and voluntarily and have knowledge of the nature of the act or transaction involved.' " (*People v. Ireland* (2010) 188 Cal.App.4th 328, 336.)

Here, after Kristen R. fell out of her moving Denali and fractured her left leg in two places, defendant returned her to the vehicle, drove to a dark alley, and refused her requests to take her to the emergency room. After some time, he "started to come on to [her]," putting his arms around her and asking for sex. Kristen R. responded: "No. I'm hurt." Defendant started "begging." Kristen R. again told him no. Defendant walked around to the passenger side of the Denali, opened the passenger door, and climbed on top of Kristen R., pushing the seat back and pulling her pants and underwear down to her ankles. Kristen R. cried and said: "No. I don't want to do this." She also said: "Stop. I'm hurting. My leg's hurt." Defendant told her she would be fine, pulled down his pants, and had sex with her. Kristen R. explained he was "very forceful" and "not taking

---

[2]     Undesignated statutory references are to the Penal Code.

14

no for an answer, just continuing to, you know, come on, it's okay, you know, I really want it; I really need it kind of a thing." At some point, Kristen R. also said: "Okay. Just do it."

Defendant's argument on appeal, that the foregoing statement amounted to consent, is premised on the notion this statement was made after Kristen R. "said no several times" and before he "undressed [her] and had intercourse." However, Kristen R.'s testimony also supports the view she made this statement as defendant was opening the passenger door from outside the Denali. If this was the case, then even if her statement could be considered consent, such consent was quickly revoked when defendant climbed on top of her and pulled her pants and underwear down. It was at this moment she cried and said, "No. I don't want to do this," and "Stop. I'm hurting. My leg's hurt." When a victim is forced to submit to intercourse after she revoked her original consent, the crime of rape is committed. (See *People v. Roundtree* (2000) 77 Cal.App.4th 846, 851.)

Moreover, even if Kristen R.'s purported consent came after all of her protests and before the act of sexual intercourse, a rape was still committed. " 'Actual consent must be distinguished from submission. [A] victim's decision to submit to an attacker's sexual demands out of fear of bodily injury is not consent [citations] because the decision is not freely and voluntarily made [citation]. A selection by the victim of the lesser of two evils—rape versus the violence threatened by the attacker if the victim resists—is hardly an exercise of free will. [Citation.]' " (*People v. Ireland*, *supra*, 188 Cal.App.4th at p. 336, quoting *People v. Giardino* (2000) 82 Cal.App.4th 454, 460, fn. 3.) Here, the evidence is more than sufficient to support the view that Kristen R. did not freely and voluntarily consent to having sex with defendant, but rather submitted to an unwanted act of sexual intercourse under the implied threat defendant would continue to withhold needed medical treatment unless she gave in to his demands. Such a decision is not an act of free will.

15

We conclude substantial evidence supports defendant's forcible rape conviction in Count One.

**B.**

***One-Strike Findings Attached to Count Five***

Defendant also argues the evidence is insufficient to support each one-strike finding attached to Count Five. We again disagree.

Section 667.61 "was enacted in 1994 as part of what is commonly known as the 'one strike' law. [Citation.] In general, it requires the trial court to sentence a defendant found guilty of committing a specified sexual offense under specified aggravating circumstances to an extremely lengthy indeterminate term―either 15 years to life or 25 years to life, depending on the particular aggravating circumstances." (*People v. Jones* (1997) 58 Cal.App.4th 693, 703.)

In Count Five, defendant was found guilty of the rape of Janet P. and was found to have committed the crime under four aggravating circumstances. Rape is one of the sexual offenses specified in former section 667.61. (Former § 667.61, subd. (c)(1); Stats. 2006, ch. 337, § 33, pp. 2639-2641, amended by Prop. 83 as approved by voters Gen. Elec. (Nov. 7, 2006); citations to former § 667.61 are to this version.) The version of the statute in effect when defendant committed this crime provided in relevant part: "(a) [A]ny person who is convicted of an offense specified in subdivision (c) under one or more of the circumstances specified in subdivision (d) or under two or more of the circumstances specified in subdivision (e) shall be punished by imprisonment in the state prison for 25 years to life. [¶] (b) Except as provided in subdivision (a) . . . , any person who is convicted of an offense specified in subdivision (c) under one of the circumstances specified in subdivision (e) shall be punished by imprisonment in the state prison for 15 years to life." (§ 667.61, subds. (a), (b).)

Two of the aggravating circumstances found true by the jury were specified in subdivision (d): "(2) The defendant kidnapped the victim of the present offense and the

16

movement of the victim substantially increased the risk of harm to the victim over and above that level of risk necessarily inherent in the underlying offense in subdivision (c). [¶] (3) The defendant inflicted aggravated mayhem or torture on the victim or another person in the commission of the present offense in violation of Section 205 or 206." (Former § 667.61, subd. (d)(2), (3).) The other two aggravating circumstances found true by the jury were specified in subdivision (e): "(3) The defendant personally inflicted great bodily injury on the victim or another person in the commission of the present offense in violation of Section 12022.53, 12022.7, or 12022.8. [¶] . . . [¶] (5) The defendant has been convicted in the present case or cases of committing an offense specified in subdivision (c) against more than one victim." (Former § 667.61, subd. (e)(3), (5).)

We conclude each of these one-strike findings is supported by substantial evidence. However, because only one of the former subdivision (d) circumstances (either (2): kidnapping or (3): mayhem/torture) need be supported by substantial evidence in order to justify defendant's sentence of 25 years to life on Count Five, and because the trial court used the multiple victim circumstance of former subdivision (e)(5) to sentence defendant to a consecutive term of 15 years to life on Count One, we shall confine our analysis to the kidnapping and multiple victim circumstance findings.

### 1. *Kidnapping Finding*

The one-strike kidnapping circumstance requires proof of two elements: "(1) a simple kidnapping (§ 207, subd. (a)); and (2) a substantial increase in the risk of harm to the victim." (*People v. Diaz* (2000) 78 Cal.App.4th 243, 246, fn. omitted.) " '[T]o prove the crime of kidnapping, the prosecution must prove three elements: (1) a person was unlawfully moved by the use of physical force or fear; (2) the movement was without the person's consent; and (3) the movement of the person was for a substantial distance.

17

(§ 207, subd. (a).)' "[3] (*People v. Dalerio* (2006) 144 Cal.App.4th 775, 781, quoting *People v. Jones* (2003) 108 Cal.App.4th 455, 462.)

Here, defendant dropped Janet P. almost 13 feet from his second-floor apartment to the concrete landing below, causing multiple pelvis fractures and a fracture of her left elbow. He then came down the stairs, grabbed her by the arms, and dragged her into the parking lot beside her truck while she pleaded: "Please stop. Please don't move me." Defendant then rolled Janet P. under the truck and told her to "be quiet" and "pretend that [she] was looking for something." Realizing she was completely incapacitated, she complied. After running upstairs and returning with a blanket, defendant wrapped the blanket around Janet P., picked her up from beneath the truck, and carried her back to his apartment. She again pleaded: "Please don't move me." Defendant does not dispute the evidence was sufficient to establish Janet P. was moved a substantial distance without her consent. Instead, citing *People v. Daniels* (2009) 176 Cal.App.4th 304, he argues in his supplemental opening brief that "the first element of simple kidnapping was not satisfied" because "there was no indication that [he] used any more physical force than was necessary to move [her]."

This argument is frivolous. Indeed, as defendant acknowledged in his original opening brief, "[t]he elements of simple kidnapping do appear to be satisfied." Defendant was right the first time. In *People v. Daniels*, *supra*, 176 Cal.App.4th 304, the Court of Appeal explained: " '[O]rdinarily the force element in section 207 requires *something more* than the quantum of physical force necessary to effect movement of the victim from one location to another.' [Citation.] Since an incapacitated person, like an

---

[3]    Section 207, subdivision (a), provides: "Every person who forcibly, or by any other means of instilling fear, steals or takes, or holds, detains, or arrests any person in this state, and carries the person into another country, state, or county, or into another part of the same county, is guilty of kidnapping."

18

infant, has no ability to resist being taken and carried away, the 'something more' that is 'ordinarily' required is not necessary, and 'the amount of force required to kidnap [an incapacitated person] is simply the amount of physical force required to take and carry the [incapacitated person] away . . . with an illegal intent.' [Citation.]" (*Id.* at p. 332.) Here, the evidence conclusively established Janet P. was incapacitated by the fall. She was unable to resist being dragged to her truck, rolled underneath the vehicle, and then carried up the stairs and placed on defendant's bed. Thus, the amount of force required to commit the crime of kidnapping was simply the amount of force required to effect Janet P.'s movement, provided defendant possessed "an illegal purpose or intent" in so moving her. (*In re Michele D.* (2002) 29 Cal.4th 600, 611.) While the jury found defendant not guilty of the crime of kidnapping for purposes of rape, he still possessed an unlawful purpose in moving Janet P. Substantial evidence supports the conclusion defendant moved her to his apartment to conceal the fact he had dropped her from his second-floor apartment and he intended to keep her there against her will until he was convinced she would lie to medical personnel about how she received her injuries. (See § 236; *People v. Dominguez* (2010) 180 Cal.App.4th 1351, 1360 [essential element of false imprisonment is restraint of the person].)

Defendant also claims the evidence was insufficient to establish the second element of the one-strike kidnapping circumstance, i.e., his movement of Janet P. substantially increased the risk of harm to her above that necessarily present in the crime of rape. (See § 667.61, subd. (d)(2); *People v. Diaz*, *supra*, 78 Cal.App.4th at p. 246.) Specifically, he argues: "[I]t cannot be said that the movement of [Janet P.] substantially increased the risk of harm to her as the movement of [Janet P.] occurred hours before the rape occurred. An examination of the evidence actually indicates that [defendant's] movement of [Janet P.] substantially *decreased* the risk of harm to [her] as it got her out of the elements and off of the ground, and enabled him to care for her and her injuries." This argument defies common sense. Regardless of whether the movement occurred

19

minutes or hours before the rape, it was the movement of Janet P. from a public area to defendant's private apartment that enabled him to commit the rape without fear of being seen. It also decreased the prospect one of defendant's neighbors would call 911 and summon the help Janet P. desperately needed. (See *People v. Shadden* (2001) 93 Cal.App.4th 164, 169 ["where a defendant moves a victim from a public area to a place out of public view, the risk of harm is increased even if the distance is short"]; *People v. Diaz*, *supra*, 78 Cal.App.4th at p. 249 ["the risk to the victim in the dark and isolated location of the attack increased significantly as compared to the lighted sidewalk near the bus stop where the incident began"].) Moreover, by dragging Janet P. through the parking lot, rolling her underneath her truck, and then carrying her up the stairs and into his apartment, defendant substantially increased the risk of aggravating the injuries he already inflicted by dropping her over his second-floor railing.

We conclude substantial evidence supports the one-strike kidnapping circumstance attached to Count Five.

### 2. *Multiple Victim Finding*

Having concluded defendant's rape conviction in Count One is supported by substantial evidence, we must reject his contention that the multiple victim aggravating circumstance finding is not supported by substantial evidence. Simply put, defendant was convicted in the present case of committing the crime of forcible rape, an offense specified in section 667.61, subdivision (c), against more than one victim. (Former § 667.61, subd. (e)(5).)

## II

### *Exclusion of Demonstrative Evidence*

Defendant claims the trial court prejudicially erred and violated his constitutional rights by precluding him from impeaching Janet P. by having her try on the jeans she wore the day of the rape. We are not persuaded.

## A.

### *Additional Background*

Janet P. testified the blue jeans she wore when defendant dropped her over the second-floor railing came off as he dragged her to her truck. She explained: "I had been losing some weight, so they -- they just rolled off of me." Janet P. also testified she "[p]robably" weighed 175 pounds at the time, which she characterized as "a hopeful guess" that "definitely could be incorrect" since she did not own a scale. She estimated her weight at the time of trial to be 195 pounds. Dawn Love, a nurse at UC Davis Medical Center, testified Janet P.'s medical records indicated a weight of 212 pounds the day after she was admitted into the intensive care unit (ICU).

The defense recalled Janet P. to testify as a defense witness. Defense counsel asked her whether or not she would be willing to try on the blue jeans in front of the jury. Janet P. answered: "Sure." After an unreported discussion in chambers, the trial court removed the jury and Janet P. from the courtroom and allowed counsel to argue the admissibility of defense counsel's proposed demonstration. Defense counsel argued the demonstration was relevant to prove Janet P.'s version of events was not credible because it "would show that those pants were tight enough that they would remain on even had she been moved in the fashion that she described."

The prosecutor argued: "Your Honor, in order for the bit of evidence to be relevant, it would have to tend to show -- it would have to rely on facts that existed as they did at the time of the incident so that the jury would then be able to judge a witness's credibility based upon what she said happened regarding those underlying facts, specifically if these jeans somehow were fitted onto [Janet P.] within a month after the incident occurred, that would give us a much better idea or a week after the incident occurred as to whether or not these jeans fit her in such a manner where when she was [dragged] across the sidewalk those jeans would have fallen off of her, that would have been perfect. [¶] The problem is now we're a year and a half [past] that time. [Janet P.]

21

has testified in her belief that she's actually put on -- it would seem to be 15 to 20 pounds. If those jeans don't fit her now, what are we proving? We're proving they don't fit her now, and that if you [dragged] her across a concrete slab right now, they wouldn't fall off her body. Great. It doesn't tell us anything about how those jeans fit her at the time, and because of that it's simply not relevant and it opens the jury up . . . to wide speculation as to why -- whether or not the jeans fit and allows them to speculate about her testimony about not being credible." The prosecutor asked the trial court to exclude the proposed demonstration based on Evidence Code section 352, arguing that whether or not the jeans fit Janet P. the night of the rape is "open to speculation and the probative value is completely overridden by that speculation and the confusion to this jury."

The trial court agreed with the prosecutor's assessment, explaining: "The difficulty I have here is we have roughly a year and a half since the events that are alleged to have occurred. We have a witness who said she weighed a lot less at the time, but at the hospital she weighed more than she thought, but I don't know how she was weighed at the hospital. I know that she was incapacitated, that is, that she was according to [her surgeon's] testimony she had four -- it looked like four fractures of the pelvic bones and would have been in a great deal of pain, so I don't know if she was weighed on a gurney, I don't know if she was weighed in some kind of a harness. I question that that would have happened given her medical situation. I don't know anything about that. [¶] We don't have testimony to that other than . . . what the actual number is that is on the medical records, but we didn't have the person who weighed her. And we have her testimony that she weighed substantially less than that at the time which would make the jeans a lot looser if . . . those are actually the jeans at all. [¶] It seems to me there was some question about that, whether they were -- she thought they were." The trial court also questioned the accuracy of Janet P.'s estimate of her current weight and further questioned whether or not "the fact that she had a badly broken pelvic area and could not control her legs" would affect the way the jeans fit on her body.

The trial court ruled the proposed demonstration would not be allowed: "I think it's widely speculative at this point. I don't think it proves anything because it's a year and a half later, her weight has changed dramatically and I think the relevance . . . is very, very much in question." The trial court also explained: "I think it would consume time, it would confuse the issues. I think it could very easily mislead the jury given the wide variations in her weight given that day to today which sounds to me like it may have varied as much as 30 pounds or more, maybe 40 pounds, and I just don't know where she is on that spectrum, and I just think under the circumstances under [Evidence Code section] 352 [its] probative value is substantially outweighed by the probability that [its] admission would . . . necessitate the undue consumption of time and could mislead the jury[.] We don't have the same -- this is not the same physical person of a year and a half ago."

Defense counsel then argued Janet P.'s current weight could be obtained "by having her stand on a scale" and her weight of 212 pounds in the ICU could be verified by recalling Love to testify regarding the procedure used to weigh her. When the trial court pointed out Love did not testify to being the person who weighed Janet P., defense counsel argued she could "describe a process by which a patient in the hospital who is unable to stand is weighed." After further discussion about whether or not Love would be able to verify Janet P.'s weight in the ICU, the trial court agreed to allow defense counsel to "bring her in" and "ask her." At this point, the prosecutor offered further argument regarding the fact Janet P. had multiple fractures to her pelvis when defendant dragged her through the parking lot, a situation that could not be replicated in the courtroom. Defense counsel responded: "They're not complete fractures, the doctor didn't testify that this was such a separation you now have three pieces of the pelvis floating around."

The trial court then confirmed its prior ruling: "But the fact is that I have an 18-month gap here in time and testimony of the witness that she weighs 15 or 20 pounds

23

more today than she did then. Then the question of how much she weighed with the hospital and how they weighed her, and we could spend the next day trying to figure out who weighed her and how that worked and -- or even more than that to try to calculate all of that for what I think is a relatively -- for a limited probative value in the case, because I don't know what effect, and I don't think we have an expert who is going to testify to this, what effect those types of injuries would have on one's ability to keep their pants up if they are being -- if they are a victim of a dragging kind of motion if they can't move their legs freely, and if the pants tend to slide because of the way she was being [dragged] at the time and her inability to hold them up because her hands weren't free or because they -- they had a belt on or they didn't have a belt on, or that the button had come loose in the fall or any number of those things I think is speculation. It is extremely high. Under [Evidence Code section] 352, I'm going to exclude the evidence. I am going to strike the question and answer, and we'll move on."

After further argument from defense counsel, the trial court indicated it would consider the matter over the lunch hour. When the proceedings resumed, defense counsel stated he had "trouble accepting the notion that there is any reason to question the accuracy of the weighing method" used at UC Davis Medical Center, but then argued there was "reason to believe that a weight of approximately 195 pounds [which Janet P. estimated to be her current weight] would also reflect her weight back then," and offered to supply the court with a scale to confirm Janet P.'s current weight. The trial court confirmed its prior rulings and excluded the proposed demonstration under Evidence Code section 352.

## B.

### *Analysis*

"No evidence is admissible except relevant evidence" and, "[e]xcept as otherwise provided by statute, all relevant evidence is admissible." (Evid. Code, §§ 350, 351.) Evidence is relevant if it has "any tendency in reason to prove or disprove any disputed

24

fact that is of consequence to the determination of the action." (Evid. Code, § 210.) Under Evidence Code section 352, the trial court may exclude relevant evidence "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

These rules apply to demonstrations. "Evidence of demonstration engaged in to test the truth of testimony that a certain thing occurred is admissible only where (1) the demonstration is relevant, (2) its conditions and those existing at the time of the alleged occurrence are shown to be substantially similar and (3) the evidence will not consume undue time or confuse or mislead the jury. [Citation.] The party offering the evidence bears the burden of showing that the foundational requirements have been satisfied." (*People v. Gilbert* (1992) 5 Cal.App.4th 1372, 1387-1388.) The reason for the substantial similarity requirement is self-evident. The probative value of demonstrative evidence "depends primarily on its similarity" to the conditions that it purports to demonstrate. (*People v. Rivera* (2011) 201 Cal.App.4th 353, 363.) "The demonstration . . . ' "must have been conducted under at least substantially similar, although not necessarily absolutely identical, conditions as those of the actual occurrence." ' [Citation.]" (*Ibid*.) Simply put, the demonstration "must be a reasonable representation of that which it is alleged to portray" and "must assist the jurors in their determination of the facts of the case, rather than serve to mislead them." (*Ibid*.)

We review the trial court's decision to exclude evidence under Evidence Code section 352 for abuse of discretion. (*People v. Minifie* (1996) 13 Cal.4th 1055, 1070.) However, while this provision "permits the trial judge to strike a careful balance between the probative value of the evidence and the danger of prejudice, confusion and undue time consumption," it also "requires that the danger of these evils substantially outweigh the probative value of the evidence. This balance is particularly delicate and critical where what is at stake is a criminal defendant's liberty." (*People v. Lavergne* (1971) 4

Cal.3d 735, 744; see *People v. Holford* (2012) 203 Cal.App.4th 155, 168 [section 352 objection should be overruled "unless the probative value is 'substantially' outweighed by the probability of a 'substantial danger' " of one of the statutory counterweights].) Thus, Evidence Code section 352 "must bow to the due process right of a defendant to a fair trial and his [or her] right to present all relevant evidence of significant probative value to his [or her] defense. [Citations.] Of course, the proffered evidence must have more than slight relevancy to the issues presented. [Citation.]" (*People v. Burrell-Hart* (1987) 192 Cal.App.3d 593, 599.)

Defendant claims the demonstration was relevant to prove Janet P. "was lying and attempting to embellish her story." He argues: "Her trying on the jeans at trial might have helped the jury make that decision. If her jeans were so loose that they were practically falling off her that would tend to support [Janet P.'s] veracity. If her jeans were so tight that they were unlikely to be removed from the friction of being dragged [to her truck] that would tend to discredit [her] and thereby support [defendant's] story." We agree the proposed demonstration would have been relevant to Janet P.'s credibility if the conditions of the demonstration were shown to be sufficiently similar to those of the night defendant dropped her from the second-floor railing and then dragged her with a broken pelvis to her truck.

Defendant made no such showing. Indeed, he acknowledges it "cannot be determined" whether Janet P.'s "current weight was dramatically different from what was weighed at the hospital," but faults the trial court for not allowing him to have Janet P. weighed on the scale defense counsel brought to court. He also complains he was not allowed to recall Love concerning "the accuracy of the weight taken at the hospital." However, even assuming Janet P.'s weight at the time of trial was "within 10 pounds or so" of her weight at the hospital, contrary to defendant's argument on appeal, this would not have "laid to rest" the trial court's "primary concerns." One major concern of the trial court was the fact it did not know whether Janet P.'s multiple pelvis fractures would

26

have affected the fit of her jeans or the ease with which they would have slid off of her body while being dragged. Defense counsel did not offer to call an expert witness to testify in this regard. On appeal, defendant argues the testimony of Janet P.'s surgeon should have been sufficient to alleviate this concern because he testified the fractures "were non-displaced." From this, defendant concludes: "Therefore the injuries would not change the shape of [Janet P.'s] pelvis and thereby affect the fit of the jeans." This is pure speculation. Like the trial court, we have no way of knowing whether multiple pelvis fractures, displaced or not, would have affected the fit of Janet P.'s jeans. We therefore conclude defendant did not carry his burden of showing the conditions of the proposed demonstration would have been substantially similar to the conditions existing the night of the crime. Nor did the exclusion of this demonstration violate defendant's constitutional rights.

## III

### *Jury Unanimity*

We also reject defendant's claim the trial court committed reversible error by failing to require the jury to indicate on the Count Two verdict form the specific act it found constituted the crime of torture.

Section 206 provides that "[e]very person who, with the intent to cause cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose, inflicts great bodily injury as defined in Section 12022.7 upon the person of another, is guilty of torture." Thus, the crime of torture has two elements: (1) the infliction of great bodily injury on another; and (2) the specific intent to cause cruel or extreme pain and suffering for revenge, extortion, persuasion, or any sadistic purpose. (*People v. Burton* (2006) 143 Cal.App.4th 447, 451-452; *People v. Lewis* (2004) 120 Cal.App.4th 882, 888.)

In Count Two, the jury found defendant guilty of torturing Janet P. During closing argument, the prosecutor argued defendant inflicted great bodily injury on Janet P. when

27

he dropped her over his second-floor railing, causing multiple pelvis fractures. The prosecutor then described defendant's acts of dragging her across the parking lot, rolling her under the truck, telling her to pretend to look for something, carrying her upstairs, and then having sex with her, all with "no regard for the pain she's in or the help she may need." The prosecutor then stated, "[t]here is more than one act of torture here," and turned to the specific intent requirement, arguing defendant dropped Janet P. over the railing "for the purpose of revenge" after she "started striking him with the towel bar to get away," and he had sex with her for the "sadistic purpose" of "inflicting pain on someone else in order to experience pleasure."

The jury was instructed on unanimity as follows: "The defendant is charged with torture in Count Two which allegedly occurred during the late evening hours of June 17th, 2010 to the early morning hours of June 18th, 2010. The People have presented evidence of more than one act to prove that the defendant committed this offense. You must not find the defendant guilty unless you all agree that the People have proved that the defendant committed at least one of these acts and you all agree on which act he committed."

Defendant does not take issue with the foregoing instruction. Instead, he argues the trial court should have further instructed the jury to indicate on the verdict form which "act" it found amounted to torture. According to defendant, the jury's failure to so indicate "is fatal to this verdict" because a torture conviction based on the act of sexual intercourse would not be supported by substantial evidence. This is so, argues defendant, because the great bodily injury occurred when Janet P. was dropped over the railing and "there is no evidence that [defendant's] act of raping [her] caused any further great bodily injury other than had already been sustained during the fall from the railing." We disagree for two reasons.

First, the torture committed against Janet P. falls within the continuous course of conduct exception to the trial court's duty to provide a unanimity instruction. In *People*

28

*v. Jenkins* (1994) 29 Cal.App.4th 287 (*Jenkins*), the Court of Appeal held the continuous course of conduct exception applied to the crime of torture. (*Id.* at p. 300.) There, the defendant was convicted of two counts of torture committed against the same victim on two separate occasions. In the first incident, the defendant "hit [the victim] with an iron or steel pipe, beat her in the face with a two by four board, kicked her with his mountain-climbing boots, choked her, pistol-whipped her and then fired a .357 magnum revolver next to her head." (*Id.* at p. 298.) In the second incident, occurring two weeks later, the defendant "repeatedly beat [the victim] with a hammer, pole and brick" and then "dragged her outside and choked her into unconsciousness." (*Ibid.*) Rejecting the defendant's argument a unanimity instruction was required based on the discrete acts of violence committed during these incidents, the court held each incident involved a continuous course of conduct. The court explained the continuous course of conduct exception arises in two contexts: " 'The first is when the acts are so closely connected that they form part of one and the same transaction, and thus one offense. [Citation.] The second is when . . . the statute contemplates a continuous course of conduct of a series of acts over a period of time. [Citation.]' " (*Id.* at p. 299.) The court further explained: " '[t]he "continuous course of conduct" exception—when the acts are so closely connected that they form one transaction—is meant to apply not to all crimes occurring during a single transaction but only to those "where the acts testified to are so closely related in time and place that the jurors reasonably must either accept or reject the victim's testimony in toto." [Citation.]' [Citation.]" (*Ibid.*) After considering "the nature of torture and the facts of the case," the court concluded the exception applied "[u]nder either analysis," explaining: " 'The *actus reus* of such a crime is a *series* of acts occurring over a substantial period of time, generally on the same victim and generally resulting in cumulative injury.' [Citation.] Additionally, [the specific incidents] each involved a beating that consisted of assaults with fists, boots, a pipe, a hammer, a

choking, and a gun shot near the victim's head, within a specifically defined period of time. The acts were closely related in time and place." (*Id*. at p. 300.)

Here, during a violent altercation in defendant's second-floor apartment, defendant said, "I'll show you," carried Janet P. out the front door, lifted her over the railing, and dropped her nearly 13 feet to the concrete landing below. There is no dispute the impact with the concrete caused great bodily injury. When defendant came down the stairs, Janet P. repeatedly asked him to call 911. Defendant refused, told her to "be quiet," and dragged her into the parking lot beside her truck while she pleaded: "Please stop. Please don't move me. I'm really hurt. Please call 911." Defendant rolled her under the truck and told her to "pretend that [she] was looking for something." He then ran upstairs and returned to with a blanket, which he wrapped around her before picking her up from beneath the truck and carrying her back to his apartment. Janet P. again pleaded: "Please don't move me." After carrying Janet P. into his bedroom and placing her on his bed, defendant ignored more pleas for help. Eventually, he told her: "You need to show me you care. I want to make love to you." Janet P. answered: "No, please don't. I'm very broken. Please call 911." Defendant brought her a pill, purportedly to make her "more comfortable," and raped her while she begged for him to stop. Janet P. described the rape as feeling like "[a] blow torch going in and out of [her] vagina." As in *Jenkins*, *supra*, 29 Cal.App.4th 287, defendant's acts were "closely related in time and place" and amounted to a continuous course of conduct such that no unanimity instruction was required. (*Id*. at p. 300.)

Second, even assuming the facts of this case warranted a unanimity instruction, such an instruction was given. Contrary to defendant's argument on appeal, it does not follow that the trial court was further required to direct the jury to indicate on the verdict form which specific act it found constituted torture. The only authority defendant cites for this proposition is dicta found in *People v. Jones* (1990) 51 Cal.3d 294, in which our Supreme Court quoted the underlying Court of Appeal decision as stating that a " 'jury

30

verdict must only contain sufficient information which reflects their unanimous selection of specific acts constituting the offense so that the appellate court on review will be able to identify those facts supporting each guilty verdict.' " (*Id*. at pp. 304-305.) That case involved the situation in which a young sexual abuse victim provided "nonspecific" testimony concerning repeated and continuous abuse endured over a period of time. (*Id*. at pp. 299-300.) The court held such testimony does not deprive the defendant of the right to a unanimous jury, explaining: "In such cases, although the jury may not be able to readily distinguish between the various acts, it is certainly capable of unanimously agreeing that they took place in the number and manner described." (*Id*. at p. 321.) The court also explained that "because credibility is usually the 'true issue' in these cases, 'the jury either will believe the child's testimony that the consistent, repetitive pattern of acts occurred or disbelieve it. In either event, a defendant will have his unanimous jury verdict [citation] and the prosecution will have proven beyond a reasonable doubt that the defendant committed a specific act, for if the jury believes the defendant committed all the acts it necessarily believes he committed each specific act [citations].' " (*Id*. at p. 322, quoting *People v. Moore* (1989) 211 Cal.App.3d 1400, 1414.)

*People v. Jones*, *supra*, 51 Cal.3d 294 simply does not support defendant's claim that when a jury is given a unanimity instruction, it must indicate on the verdict form the specific acts found to constitute the crime. In many cases, such a jury "may not be able to readily distinguish between the various acts," and therefore would not be able to specify on the verdict form which acts constituted which particular crime, but this does not deprive the defendant of a unanimous verdict. (*Id*. at p. 321.) Accordingly, even if a unanimity instruction was required in this case, defendant has cited no authority for the proposition that the trial court was required to instruct the jury to indicate on the Count Two verdict form the specific act it found constituted the crime of torture. Nor does defendant explain how such a requirement would be squared with " '[t]he rule against special verdicts and special questions in criminal cases.' " (*People v. Williams* (2001) 25

31

Cal.4th 441, 450, quoting *United States v. McCracken* (5th Cir.1974) 488 F.2d 406, 419; *United States v. Wilson* (6th Cir.1980) 629 F.2d 439, 443 ["submitting special questions to the jury invades the province of the jury"].)

We conclude the jury was not required to indicate on the Count Two verdict form the specific act it found constituted the crime of torture.

## IV

### *Removal of Juror No. 7*

Defendant further asserts the trial court abused its discretion and violated his constitutional rights by removing Juror No. 7 during deliberations without a sufficient showing of good cause. Not so.

### A.

### *Additional Background*

During deliberations, the jury foreperson sent a note to the trial court stating that "one of the jurors did some research on their own." Brought into the courtroom for questioning, the foreperson explained Juror No. 7 revealed during deliberations that he "went home and researched [one of the counts] in his law books," and this research "supported his decision" regarding how to vote on that count. When the foreperson told Juror No. 7 independent research was not allowed, the conversation ended.

Juror No. 7 was then questioned on the matter. He explained: "I just researched the definition of -- basically just getting clarification of what actually is consent and duress." He used an online dictionary to do this, and also looked, "to a degree," into a "pre-law" text book. When the trial court asked whether he remembered being instructed not to do any research of any kind, Juror No. 7 answered: "Um, as I interpreted it, it was like -- as far as like any -- like law or as far as the case, but I may have been mistaken." Asked what he said in deliberations, Juror No. 7 explained he told the other jurors his opinion regarding one of the counts was based on the definition of duress and consent he obtained through his own research. He then confirmed the conversation ended when

32

another juror told him outside research was not allowed. According to Juror No. 7, the definitions he found online and in the text book were "very similar" to those contained in jury instructions.

The trial court took a short recess and then returned Juror No. 7 to the courtroom for further questioning. After re-reading CALCRIM No. 201, which included the admonition, "Do not use a dictionary, the Internet or other reference materials," the trial court asked Juror No. 7 whether he remembered that instruction. He answered: "Um, yeah. Probably certain elements, I may have forgotten that, but I do remember you reading that instruction." The trial court pressed: "But you did do independent research on your own?" Juror No. 7 responded: "Well, just the fact of looking up a specific definition, and that was the only thing after we had went into deliberations." He explained that he did not believe he was violating the trial court's instruction regarding independent research because he "didn't actually remember specifically as far as looking up the definition or the Dictionary part" of the instruction. The trial court then asked: "In fact, I believe I gave this instruction a number of times during the trial. [¶] Do not do any research on your own. Do not use a Dictionary, the Internet or other reference materials. [¶] You don't recall me saying that at all?" Juror No. 7 responded: "Yes, I recall you saying that." He then acknowledged his conduct violated the instruction.

The trial court removed Juror No. 7 from the jury and replaced him with an alternate, explaining: "It's not an easy decision to make, but I think this was a deliberate violation of my instruction by [Juror No. 7], and I do not see, after what -- the comments I just heard, that he has -- that he would have the ability to follow my instructions in the future, and given his failure to perceive this as a -- as a real problem." The trial court found Juror No. 7 was not "being terribly honest" in his answers to the court's questioning, and further explained: "I believe it's real misconduct, and I believe he tried to use that misconduct to -- to have an [effect] on the other jurors in the case. He brought it up in front of them; didn't hold it to himself. Hey, listen, I did research and it confirms

33

I'm right.  [¶]  I don't know what I'm right means.  I don't know if he is pro defense.  I don't know if he is pro prosecution. . . .  [¶]  I found that there is misconduct in this case, very clear misconduct, and I can excise that now by taking this juror who engaged in that conduct and when I asked him questions here, didn't seem to think that was much of a problem . . . ."

## B.

### *Analysis*

Section 1089 gives the trial court the authority to discharge a juror who, upon good cause shown, is found to be unable to perform his or her duty.  " '[A] juror's serious and willful misconduct is good cause to believe that the juror will not be able to perform his or her duty.'  [Citation.]"  (*People v. Ledesma* (2006) 39 Cal.4th 641, 743.)  "A trial court's decision to discharge a juror for misconduct is reviewed for abuse of discretion and is upheld if supported by substantial evidence."  (*Ibid*.)  However, in order to protect a defendant's constitutional rights to due process and to a fair trial, "a juror's inability to perform as a juror must be shown as a 'demonstrable reality.' "  (*People v. Wilson* (2008) 44 Cal.4th 758, 821.)

"Whether misconduct is 'serious and willful' is for the trial court to determine." (*People v. Lopez* (1993) 13 Cal.App.4th 1840, 1844.)  Here, Juror No. 7 admitted to looking up the definition of consent and duress in an online dictionary and a pre-law text book in violation of the trial court's instructions.  He also admitted to informing his fellow jurors the definitions he found supported his conclusion regarding one of the counts.  We agree with the trial court this amounts to serious misconduct.  Contrary to defendant's argument on appeal, this case is not like *People v. Hamilton* (1963) 60 Cal.2d 105 (*Hamilton*), disapproved on other grounds in *People v. Daniels* (1991) 52 Cal.3d 815, in which our Supreme Court held "the mere reading of the Penal Code, *for the sole purpose of becoming better informed*, cannot, *without more*, be either misconduct or an act which results in inability to perform the duties of a juror.  If the juror had given any

34

indication that she would substitute her knowledge (gained from reading the code) for the instructions of the court, *or would convey such knowledge to the other jurors*, then it might have been said that she was incapable of performing her duties." (*Hamilton*, *supra*, 60 Cal.2d at p. 126, italics added.) Juror No. 7's research was not for the sole purpose of becoming better informed, but was instead designed to help him determine how to vote with respect to one of the counts alleged against defendant. And here, the "more" that was lacking in *Hamilton* is present since Juror No. 7 admitted to informing his fellow jurors of his definitional discovery.

With respect to whether or not the misconduct was willful, defendant's responses to questioning conflicted. After stating he remembered the trial court giving the instruction, but that he "may have forgotten" the part about not looking in the dictionary, he stated he did "recall" the trial court admonishing the jury several times not to use the dictionary, the Internet, or other reference materials to conduct independent research. The trial court did not believe Juror No. 7's innocent explanation for the misconduct. " '[W]here equivocal or conflicting responses are elicited regarding a . . . juror's ability . . . , the trial court's determination as to his true state of mind is binding on an appellate court.' [Citations.]" (*People v. Lopez, supra*, 13 Cal.App.4th at p. 1844.)

Substantial evidence supports the trial court's determination that the misconduct engaged in by Juror No. 7 was serious and willful, and therefore amounted to good cause to believe he would be unable to perform his duty as a juror. (See *People v. Ledesma*, *supra*, 39 Cal.4th at p. 743.)

## V

### *Multiple One-Strike Sentences*

Finally, we reject an argument raised in the amicus curiae brief of defendant's trial counsel. The trial court sentenced defendant to serve a term of 25 years to life on Count Five under former section 667.61, subdivision (a), based on one of the subdivision (d) aggravating circumstance findings. Relying on *People v. Murphy* (1998) 65 Cal.App.4th

35

35, the trial court also sentenced defendant to serve a consecutive term of 15 years to life on Count One under subdivision (b) of this section, based on the multiple victim aggravating circumstance of subdivision (e)(5). Defendant's trial counsel argues multiple one-strike sentences in these circumstances violates former subdivision (f). He is mistaken.

Former section 667.61, subdivision (f) provided: "If only the minimum number of circumstances specified in subdivision (d) or (e) that are required for the punishment provided in subdivision (a) or (b) to apply have been pled and proved, that circumstance or those circumstances shall be used as the basis for imposing the term provided in subdivision (a) or (b), whichever is greater, rather than being used to impose the punishment authorized under any other provision of law, unless another provision of law provides for a greater penalty or the punishment under another provision of law can be imposed in addition to the punishment provided by this section. However, if any additional circumstance or circumstances specified in subdivision (d) or (e) have been pled and proved, the minimum number of circumstances shall be used as the basis for imposing the term provided in subdivision (a), and any other additional circumstance or circumstances shall be used to impose any punishment or enhancement authorized under any other provision of law."

In *People v. Murphy*, *supra*, 65 Cal.App.4th 35, the Court of Appeal held former section 667.61 required the trial court to sentence the defendant to two consecutive terms of 15 years to life where he was convicted of committing an offense specified in subdivision (c) against separate victims on separate occasions and the only aggravating circumstance found to be true was the multiple victim circumstance of former subdivision (e)(5). (*Id*. at pp. 40-41.) The court explained: "When offenses against multiple victims are tried together, the trial court follows the same procedure for each victim. First, the trial court determines if the defendant has been convicted of a violent sex offense specified in section 667.61, subdivision (c). If he has, the court then determines whether

36

one or more of the circumstances listed in subdivisions (d) and/or (e) apply to that offense.  If one or more of the listed circumstances applies the court sentences the defendant to life imprisonment with possibility of parole under either subdivision (a) or (b), depending on the circumstances it found applicable under subdivisions (d) and/or (e). [¶]  The only limitation on the number of life sentences which can be imposed is contained in section 667.61, subdivision (g), which provides that the defendant shall be sentenced to one life term per victim per occasion no matter how many offenses listed in subdivision (c) the defendant committed against a particular victim on a particular occasion." (*Ibid.*)

Similarly, in *People v. Valdez* (2011) 193 Cal.App.4th 1515, the Court of Appeal held the trial court properly imposed four consecutive terms of 15 years to life based on the multiple victim aggravating circumstance where two such terms involved an offense specified in former section 667.61, subdivision (c), that was committed against the same victim on separate occasions.  (*Id.* at pp. 1521-1522.)  Rejecting the defendant's argument former subdivision (f) "limits the application of a one strike life term so that it can be imposed only once for each victim if the sole qualifying factual circumstance is the commission of a predicate offense 'against more than one victim' under section 667.61, former subdivision (e)(5)," the court explained:  "Nothing in that provision even hints at an intent to limit imposition of the subdivision (b) one strike life term, based on the multiple-victim circumstance.  Rather, it evinces the intent to ensure the greatest possible punishment under that sentencing scheme."  (*Id.* at pp. 1522-1523.)

The same reasoning applies with greater force to the circumstances in this case. Because defendant was convicted of two counts of forcible rape, an offense specified in former section 667.61, subdivision (c), committed against two victims, Kristen R. and Janet P., the trial court was required to follow the same procedure for each victim.  With respect to the rape committed against Janet P., the prosecution pled and proved two aggravating circumstances under former subdivision (d) and two aggravating

circumstances under former subdivision (e).  Thus, former subdivision (f) required the trial court to use "the minimum number of circumstances" necessary to "impos[e] the term provided in subdivision (a)," i.e., 25 years to life.  (Former § 667.61, subd. (f).)  The trial court did so, using one of the subdivision (d) circumstances.  Turning to the rape committed against Kristen R., the only aggravating circumstance applicable to this crime was the multiple victim circumstance of former subdivision (e)(5).  Because one aggravating circumstance under subdivision (e) is "the minimum number . . . required for the punishment provided in subdivision . . . (b)," but not sufficient to impose the greater punishment provided in subdivision (a), the trial court was required to use the multiple victim circumstance to impose subdivision (b)'s punishment of 15 years to life.  (Former § 667.61, subd. (f).)  The trial court did so, and properly imposed this sentence consecutively pursuant to former section 667.61, subdivision (i).

Defendant's trial counsel agrees former subdivision (f) required the trial court to impose a sentence of 25 years to life for the rape committed against Janet P. by using one of the subdivision (d) aggravating circumstances, but argues that because this provision also requires the trial court to use any "additional circumstances to impose any punishment or enhancement authorized *under any other provision of law*," the trial court could not use the additional multiple victim circumstance to impose a separate aggravated sentence of 15 years to life "**under section 667.61**" for the rape committed against Kristen R.  Had the trial court imposed a term of 25 years to life for the rape committed against Janet P. based on the kidnapping aggravating circumstance and then used the multiple victim circumstance to impose an additional term of 15 years to life for this same rape, we would agree.  But trial counsel's argument fails to appreciate that the sentencing procedure found in former subdivision (f) begins anew with each victim.  (*People v. Murphy*, *supra*, 65 Cal.App.4th at p. 40.)  Having imposed the mandatory sentence of 25 years to life for the rape committed against Janet P., the trial court was required to use any aggravating circumstance applicable to the rape committed against

38

Kristen R. to impose the greatest possible term for that crime. (See *People v. Valdez*, *supra*, 193 Cal.App.4th at p. 1523 [former subdivision (f) "evinces the intent to ensure the greatest possible punishment under [the one strike] sentencing scheme"].) There was no sentencing error.

## DISPOSITION

The judgment is affirmed.


      HOCH    , J.


We concur:


      BLEASE   , Acting P. J.


      MAURO   , J.